THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| T.C., and MR. J.C. and MRS. K.C., in their own right, | ) ) ) | Civil Action No. 17-1507 |
| Plaintiffs, | ) ) | Chief Magistrate Judge Maureen P. Kelly |
| v. | ) ) | Re: ECF No. 9 |
| HEMPFIELD AREA SCHOOL DISTRICT, | ) ) ) | |
| Defendant. | ) ) | |

## OPINION AND ORDER

### I.    INTRODUCTION

This action was brought under the Individuals with Disabilities Education Improvement Act (the "IDEA"), 20 U.S.C. §§ 1400 *et seq.* by T.C., and his parents, Mr. J.C. and Mrs. K.C. in their own right, against Hempfield Area School District ("School District"). Plaintiffs assert nine causes of actions arising out of allegations that T.C., a student with a disability, was the victim of bullying by peers at a Vocational Center where he received a portion of his education provided by the School District. The School District has filed a Partial Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(b)(7), and 19. ECF No. 9. As more fully explained below, the School District's motion will be denied.

### II.    FACTUAL BACKGROUND

The relevant facts necessary for resolution of the Partial Motion to Dismiss are as follows. T.C. is a student in the Hempfield Area School District. ECF No. 1 ¶ 6. He was 19 at the time of filing of the Complaint. Id. ¶ 22. T.C. is eligible for special education pursuant to

the IDEA based on his disabilities of Autism and Other Health Impairment.  Id. ¶ 6.  T.C. was

deemed eligible for special education since he moved to the School District in 2009.  Id. ¶¶ 31-

32.  Pursuant to the IDEA, T.C. had an Individual Education Plan ("IEP") that was regularly

reviewed and adjusted at IEP meetings by T.C.'s IEP team.  See, e.g., Id. ¶¶ 35, 43, 45, 59, 61,

72, 74, 77.  In January 2014, T.C was diagnosed with Crohn's disease.  Id. ¶ 28.

An IEP meeting was held in April 2014. During the meeting, the IEP team, which

included T.C.'s parents, agreed that T.C. would be enrolled in the Central Westmoreland Career

& Technology Center (the "Vocational Center"), a county "Vocational Technical Program," for

the upcoming school year.  Id. ¶¶ 43, 44.  T.C. began attending the Vocational Center at the start

of the 2014-2015 school year when he was in the 10th grade.  Id. ¶ 48.  The Vocational Center

provided classroom instruction and skills practice instruction in an open area.  Id. ¶ 49.

Plaintiffs allege that because employees of the Vocational Center "provided a portion of

the statutorily-mandated educational services guaranteed T.C. by his Individualized Education

Program[, the Vocational Center] served as an agent of the [School] District."  Id. ¶ 10.

Plaintiffs also allege that in the implementation of T.C.'s IEP the "actions of [Vocational Center]

employees . . . are appropriately attributed to [the School District]."  Id. ¶ 12.  In addition,

Plaintiffs allege that the relationship between the Vocational Center include the following items:

- students in ninth grade attend an assembly to learn about programs at the
  Vocational Center available to students starting in 10th grade;

- the School District contracts with the Vocational Center to provide transition
  services to students who require special education services;

- Vocational Center students review the Vocational Center's student handbook,
  which contains the center's bullying policy;

- a School District coordinator is responsible for overseeing students at the

Vocational Center; the Vocational Center provides quarterly progress reports to the School District;

- School District and Vocational Center staff communicated regularly about students as needed; and

- the School District staff believed that Vocational Center staff would advise the School District of any concerns.

Id. ¶¶ 137-141.

At an IEP meeting held in March 2015, with a special education teacher from the vocational program participating in the meeting, T.C.'s parents expressed concerns about T.C.'s safety.  Id. ¶ 61.  T.C.'s IEP for transitioning to the 2015-2016 school year included continued attendance at the Vocational Center, with an afternoon return to the high school for certain classes.  Id. ¶ 62.  T.C. attended the Vocational Center at the start of the 2015-2016 school year. Id. ¶ 67.  In September 2015, T.C. began to inform his parents about the bullying he was experiencing at the Vocational Center.  Id. ¶ 69.

Mr. J.C. immediately informed the high school special education teacher about the bullying incidents.  Id. ¶ 70.  The high school special education teacher reached out to the District representative about the incidents.  Id.  The School District then contacted the Vocational Center to obtain information about the bullying incidents reported by T.C.  Id. ¶ 71.  An IEP team meeting to address the reported bullying incidents was held on September 29, 2015.  Id. ¶ 72.  At the meeting, the team learned that while at the Vocational Center T.C. was physically assaulted by peers, he was locked in a room by peers, and peers pounded on the restroom door when T.C. was using the facility.  Id. ¶ 73. As a result, the IEP team revised T.C.'s IEP to provide for him to return to the high school full time.  Id. ¶ 74.

T.C.'s IEP was revised again in March 2016, after T.C.'s parents provided input regarding T.C.'s medical and disability-related needs, his difficulty with social interaction, his tendency to smile at inappropriate times, and his dislike of large groups. Id. ¶ 77. In April 2016, due to an increase in anxiety and Crohn's disease symptoms, T.C. was provided homebound instruction. Id. ¶ 79. During therapy, T.C. disclosed that while at the Vocational Center he was sodomized with a broomstick by other students. Id. ¶ 80.

Eric Westenford, the then-principal of the Vocational Center initiated an investigation into the incidents reported by T.C. Id. ¶ 83. He interviewed students, reviewed available surveillance video, and talked with teachers. Id. ¶ 84. Interviews of students revealed that a student had held a classroom door shut with T.C. inside; students would pound on restroom door when T.C. (and another student) were inside; some students would touch or poke other students on a private body part; a student dared T.C. to pick up food from the floor and eat it; and students would throw other students backpacks down the stairs. Id. ¶¶ 85-88, 90. T.C.'s Vocational Center teacher confirmed that students would pound on the restroom door when T.C. and another student were inside. Id. ¶ 86. The only relevant incident found on videotape during the investigation was a student holding the restroom door open so that T.C. could not close the door. Id. ¶ 89. (Video surveillance equipment retains only two to three weeks of footage before it is recorded over.) The Vocational Center "administrator determined that none of the incidents described through the investigation, as verified by the video surveillance footage, rose to the level of bullying according to its policy." Id. ¶ 92.

T.C. transferred to an Intermediate Unit program at the start of the 2016-2017 school year after an IEP team meeting in July 2016. Id. ¶¶ 104, 105, 109. On March 6, 2017, Plaintiffs filed

a request for an administrative Due Process hearing with the Office of Dispute Resolution.  Id. ¶ 17.  Plaintiffs alleged that the School District violated the IDEA, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, by failing to provide T.C. with a free, appropriate public education ("FAPE"), and sought declaratory relief, reimbursement of private expenses, and compensatory education.  Id. ¶¶ 17-18.

The Hearing Officer issued a decision dated August 21, 2017, finding that the School District failed in its FAPE obligations during the 2014-2015 and 2015-2016 school years; that the School District did not discriminate against T.C. or act with deliberate indifference toward him; and that the School District was not obligated to reimburse T.C.'s parents for counseling and mental health services.  Id. ¶ 20.  The Hearing Officer ordered the School District to provide 2.25 hours of compensatory education per day for each day T.C. attended during the years the School District failed in its FAPE obligations.  Id. ¶ 20.

The Hearing Officer concluded that "critically, the record evidence is also plain that there was inadequate supervision of [T.C.] and peers at the [Vocational Center], such that [T.C.] was the victim of a number of instances of bullying that were directly related to [T.C.'s] disabilities despite school-wide policies to prevent such occurrences."  ECF No. 1-2 at 24 (Hearing Officer Decision, Aug. 21, 2017).  The Hearing Officer noted that the above conclusion was reached under both the Vocational Center and the School District's bullying policy and definition of bullying.  Id. at 24 n. 11.  The Hearing Officer also stated that "[t]here can be no doubt on this record that the bullying to which [T.C.] was subject[ed] resulted in substantial restriction of

[T.C.'s] opportunities for learning . . . and, thus, amounted to a denial of FAPE for which compensatory education will be awarded." Id. at 25-26.

On November 17, 2017, Plaintiffs filed the instant Complaint alleging, in part, that the Hearing Officer made an error of law in finding that the School District was not deliberately indifferent to T.C. and thus did not violate Section 504 of the Rehabilitation Act. ECF No. 1 ¶ 2. Plaintiffs also seek monetary damages for the School District's denial of FAPE in addition to compensatory education alleging that the compensatory education awarded by the Hearing Officer is in error as insufficient to address the School District's violation. Id. ¶ 3.

Plaintiffs assert nine claims against the School District. Plaintiffs allege that the School District violated T.C.'s rights under Section 504 of the Rehabilitation Act (Count I) and Title II of the Americans with Disabilities Act (Count II). Mr. J.C. and Mrs. K.C. assert associational discrimination claims under Section 504 of the Rehabilitation Act (Count III) and Title II of the Americans with Disabilities Act (Count IV). Plaintiffs also assert four claims pursuant to 42 U.S.C. § 1983, alleging breach of a special custodial relationship (Count V), state created danger in violation of the Fourteenth Amendment (Count VI), violation of Mr. J.C. and Mrs. K.C.'s liberty interest (Count VII), and failure to train (Count [VIII]). Finally, Plaintiffs assert a claim for Attorneys' Fees and Costs (Count [IX]) due to their prevailing party status in the administrative proceeding against the School District.[1]

In the pending Partial Motion to Dismiss, the School District seeks dismissal of the Complaint insofar as Plaintiff alleges that the Vocational Center was acting as the School District's agent. The School District argues that Plaintiffs have failed to assert a proper factual

---

[1] There are nine claims, but Plaintiffs did not label any claim as "Count VIII". Thus, counts eight and nine are identified as Count IX and Count X, respectively.

basis to sustain a claim of agency.  Next, the School District argues that Plaintiff's Section 1983

failure to train claim must be dismissed because it lacks any factual basis.  The School District

also presents a Rule 12(b)(7) argument that Plaintiffs have failed to join a necessary party under

Rule 19; namely, the Central Westmoreland Career & Technology Center.  Finally, the School

District seeks dismissal of Mrs. K.C.'s associational discrimination claims brought under Section

504 of the Rehabilitation Act and Title II of the ADA.

## III.     STANDARD OF REVIEW

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light

most favorable to the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief."  Eid v. Thompson, 740 F.3d 118, 122 (3d Cir.

2014) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)).  "As

explicated in Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), a claimant must state a 'plausible'

claim for relief, and '[a] claim has facial plausibility when the pleaded factual content allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"

Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 147 (3d Cir. 2014).  "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." Iqbal, 556 U.S. at 678.  In short, a motion to dismiss should be granted if a party does

not allege facts which could, if established at trial, entitle him to relief. See Fowler v. UPMC

Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  In addition to the complaint, courts may consider

matters of public record and other matters of which a court may take judicial notice, court orders,

and exhibits attached to the complaint when adjudicating a motion to dismiss under Rule

12(b)(6).  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994)

(citing 5A Wright and Miller, Federal Practice and Procedure: Civil 2d, § 1357; Chester County

Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990)).

A pleading party need not establish the elements of a *prima facie* case at this stage; the

party must only "put forth allegations that 'raise a reasonable expectation that discovery will reveal

evidence of the necessary element[s].'" Fowler v. UPMC Shadyside, 578 F.3d 203, 213 (3d Cir.

2009) (quoting Graff v. Subbiah Cardiology Associates, Ltd., 2008 WL 2312671 (W.D. Pa. June

4, 2008)); see also Connelly v. Lane Const. Corp., 809 F.3d 780, 790 (3d Cir. 2016) ("Although a

reviewing court now affirmatively disregards a pleading's legal conclusions, it must still . . .

assume all remaining factual allegations to be true, construe those truths in the light most favorable

to the plaintiff, and then draw all reasonable inferences from them.") (citing Foglia v. Renal

Ventures Mgmt., LLC, 754 F.3d 153, 154 n. 1 (3d Cir. 2014)).

Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal

conclusions cast in the form of factual averments.  Morse v. Lower Merion School District, 132

F.3d 902, 906, n. 8 (3d Cir. 1997).  The primary question in deciding a motion to dismiss is not

whether the Plaintiff will ultimately prevail, but rather whether he or she is entitled to offer

evidence to establish the facts alleged in the complaint.  Maio v. Aetna, 221 F.3d 472, 482 (3d Cir.

2000).  The purpose of a motion to dismiss is to "streamline [ ] litigation by dispensing with

needless discovery and factfinding."  Neitzke v. Williams, 490 U.S. 319, 326–327 (1989).

## IV.    DISCUSSION

The Court will first address the School District's argument that Plaintiffs have failed to

assert a proper factual basis to sustain a claim of agency.  Next, the Court discusses the School

District's motion to dismiss Plaintiff's failure to train claim, followed by a discussion of whether Plaintiffs have failed to join a necessary party under Rule 19. Finally, the Court discusses whether Mrs. K.C. has properly stated a claim for associational discrimination.

### A. Agency

Plaintiffs assert an agency relationship between the School District and the Vocational Center. Ultimately this is a legal conclusion and the School District argues that Plaintiffs have failed to set forth sufficient factual averments to sustain a claim of agency.

The "three basic elements of agency are: '"the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking."'" Basile v. H & R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000) (quoting Scott v. Purcell, 415 A.2d 56, 60 (Pa. 1980), quoting Restatement (Second) of Agency § 1, Comment b (1958)). "'The creation of an agency relationship requires no special formalities.'" Walton v. Johnson, 2013 Pa. Super 108, 66 A.3d 782, 787 (2013) (quoting B & L Asphalt Industries, Inc. v. Fusco, 753 A.2d 264, 269 (Pa. Super. 2000)).

The School District defines the key inquiry to an agency relationship as whether the School District retained control over the manner and means by which the Vocational Center provided education to T.C., as opposed to whether the School District merely was concerned with the outcome of T.C.'s education at the Vocational Center. ECF No. 10 at 7. The School District narrows this issue further to: whether the School District had the ability to control the manner in which Vocational Center employees supervised T.C. and whether the School District had the ability to control how Vocational Center employees responded to bullying. Id. Given the

facts alleged in the Complaint, however, the School District does not explain upon what basis the Court must, at this initial stage of the pleadings, decide that agency is as narrowly framed by the School District. Rather, reading Plaintiffs' Complaint in a light most favorable to Plaintiffs, the Court concludes that Plaintiffs have sufficiently plead claims based on an agency relationship to survive a motion to dismiss.

Plaintiffs allege in the Complaint that the School District qualifies as a Local Education Agency ("LEA") that receives federal funds and is therefore subject to the provision of the IDEA. T.C. qualified for special education pursuant to the IDEA based on his disabilities and the School District provided special education services to T.C. through an IEP that was regularly reviewed and updated. As provided in his IEP, part of T.C.'s special education was provided by employees at the Vocational Center. Through implementation of T.C.'s IEP, the School District manifested that the Vocational Center shall act to provide a part of T.C.'s statutorily mandated educational services that the School District was under an obligation to provide to T.C. Basile, 761 A.2d at 1120. The Vocational Center accepted the undertaking from the School District to provide services to T.C. pursuant to T.C.'s IEP. Id. Both the School District and the Vocational Center understood that implementation of the IEP was in fact controlled by the School District. Id. These allegations qualify as "allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" Fowler, 578 F.3d at 213. Accordingly, the School District's motion to dismiss based on the failure to state a claim of agency between the School District and the Vocational Center will be denied.

**B.      Section 1983 Failure to Train**

Plaintiffs assert that the School District is liable for a Section 1983 failure to train claim alleging that the decision makers failed to create and implement a policy and practice of properly training Vocational Center staff to protect students who are identified as requiring special education services and supports.  ECF No. 1 ¶ 212.   Plaintiffs further allege that the School District is liable for failing to train and supervise its agents and employees charged with the care and custody of students with disabilities who participate in Vocational Center programs.  Id. ¶ 213.  Finally, Plaintiffs allege that the School District's failure to adequately train Vocational Center employees amounts to deliberate indifference and that as a result T.C. suffered injuries. Id. ¶¶ 214-16.

 The United States Supreme Court has recognized that "there are limited circumstances in which an allegation of 'failure to train' can be the basis for liability under § 1983."  City of Canton, Ohio v. Harris, 489 U.S. 378, 387 (1989).  "Where the policy 'concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact.'"   Thomas v. Cumberland Cty., 749 F.3d 217, 222 (3d Cir. 2014) (quoting Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999)).  "Additionally, 'the identified deficiency in a city's training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." Thomas, 749 F.3d at 222 (quoting Canton, 489 U.S. at 391).

Here, the School District argues that Plaintiffs are required to identify the training program and specify the program or policies alleged deficiencies.  ECF No. 10 at 10.  However,

at the motion to dismiss stage, Plaintiffs need not plead such specific facts. In reviewing a District Court's dismissal of a failure to train claim the United States Court of Appeals for the Third Circuit reversed stating that the "District Court's insistence that [plaintiff] must identify a particular policy and attribute it to a policymaker, at the pleading stage without benefit of discovery, is unduly harsh." Carter, 181 F.3d at 357–58. In Carter, the plaintiff alleged that defendant's misconduct reflected inadequate training and supervision, and the Third Circuit concluded that plaintiff "cannot be expected to know, without discovery, exactly what training policies were in place or how they were adopted." Id. at 358. See also Walker v. City of New York, 974 F.2d 293, 300 (2d Cir. 1992) ("Walker should be allowed to pursue discovery in order to determine whether there was a practice of condoning perjury (evidenced perhaps by a failure to discipline for perjury) or a pattern of police misconduct sufficient to require the police department to train and supervise police officers to assure they tell the truth"); and Doe v. N. Allegheny Sch. Dist., No. 2:08-CV-1383, 2009 WL 3166434, at *4 (W.D. Pa. Sept. 28, 2009) (allegation that Defendants acted with deliberate indifference in failing to implement and enforce security/safety policies and security procedures enacted to protect students from other students sufficient to survive motion to dismiss). Accordingly, the Motion to Dismiss as to the failure to train claim is denied.

### C. Joinder

Next, the School District moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(7), for failure to join the Central Westmoreland Career & Technology Center as a required party under Rule 19. Rule 19 specifies the circumstances in which the joinder of a particular party is compulsory." Gen. Refractories Co. v. First State Ins. Co., 500

F.3d 306, 312 (3d Cir. 2007).  The School District argues that the Vocational Center is a required

party to this action under Rule 19(a)(1)(B)(i) and (ii), which provides as follows:

> **(a) Persons Required to Be Joined if Feasible.**
>
> > **(1) Required Party.** A person who is subject to service of process and whose
> > joinder will not deprive the court of subject matter must be joined as a
> > party if
> > . . .
> > > **(B)** that person claims an interest relating to the subject of the action and is
> > > so situated that the disposing of the action in the person's absence
> > > may:
> > > > **(i)** as a practical matter impair or impede the person's ability to protect
> > > > the interest; or
> > > > **(ii)** leave an existing party subject to a substantial risk of incurring
> > > > double, multiple, or otherwise inconsistent obligations because of
> > > > the interest.

Fed. R. Civ. Proc. 19(a)(1)(b)(i) and (ii).

Specifically, the School District argues that because the Complaint focuses on the acts

and omissions of Vocational Center employees in monitoring its students and responding to the

incidents of bullying, the Vocational Center's practices, policies, and procedures are central to

the action.  The School District avers that if the actions of the Vocational Center are found to be

improper, the Vocational Center may be required to implement significant changes to remedy

deficiencies such as hiring additional staff, revising policies and procedures, or making building

modifications.  The Vocational Center may also be exposed to additional liability if it is

constitutionally required to make changes and does not.  The School District argues that the

Vocational Center cannot protect its interest in this action if it is not a party and the School

District cannot adequately defend the Vocational Center's interests.  Accordingly, the School

District concludes that that the Vocational Center must be joined as a party.

Under Rule 19(a)(1)(B)(i), "the court must decide whether determination of the rights of those persons named as parties to the action would impair or impede an absent party's ability to protect its interest in the subject matter of the litigation." Gen. Refractories Co., 500 F.3d at 316 (citing former Rule 19(a)(2)(i), now Rule 19(a)(1)(B)(i)[2]). The Third Circuit has explained that just because the outcome of a case may act as "persuasive precedent" against an absent party, the Court was "not inclined to hold that any potential effect the doctrine [of *stare decisis*] may have on an absent party's rights makes the absent party's joinder compulsory under Rule 19." Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 407 (3d Cir. 1993). Under Rule 19(a)(1)(B)(ii), "the court is not to be concerned about whether an absent party would be subject to the risk of multiple or inconsistent obligations, but rather '*an existing party.*'" Pittsburgh Logistics Sys., Inc. v. C.R. England, Inc., 669 F. Supp. 2d 613, 620 (W.D. Pa. 2009) (emphasis in original) (quoting Am. Home Mortgage Corp. v. First Am. Title Ins. Co., CA No. 07–1257, 2007 WL 3349320, *6–7, 2007 U.S. Dist. LEXIS 83337, *23 (D.N.J. Nov. 9, 2007)).

The Court concludes that the Central Westmoreland Career & Technology Center is not a required party to this action. The School District has the obligation to provide educational services under the IDEA, Section 504 of the Rehabilitation Act, and the ADA. In undertaking its obligations, the School District developed an IEP for T.C. that provided for T.C. to receive a portion of his education at the Vocational Center. The School District speculates that a finding that the Vocational Center acted improperly may affect the Vocational Center's interest in its practices, policies, and procedures, as well as its economic interest in practical matters related to

---

[2] Rule 19 was amended in 2007 "as part of the general restyling of the Civil Rules to make them more easily understood.... [t]hese changes are intended to be stylistic only." Fed.R.Civ.P. 19 advisory committee's note (discussing the 2007 amendments).

staffing and the physical structure of the center's classrooms. The Court disagrees that a disposition of this action in the absence of the Vocational Center would impair or impede the center's ability to protect these interests.

A disposition in this action against the School District may result in findings that affect the School District's relationship with the Vocational Center in regards to future placement of district students with IEP's at the Vocational Center. It is possible that the School District and the Vocational Center may have to engage in discussions about future placements at the Vocational Center, at which time the Vocational Center would be able to protect its interests and make its own determinations as to changes in policies, staffing, and building modifications. The School District has indicated possible effects on the Vocational Center, but has not set forth the kind of direct and immediate effects that a judgment in the Vocational Center's absence would have on the Vocational Center sufficient to require joinder. Janney Montgomery Scott, 11 F.3d at 407. Finally, there is no risk that either Plaintiffs or the School District would be subject to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the [Vocational Center's] interest." Fed. R. Civ. Proc. 19(a)(1)(B)(ii). Accordingly, the School District's Motion to Dismiss for failure to join a required party will be denied.

### D. Associational Discrimination Claim of Mrs. K.C.

"'It is widely accepted that under both the [Rehabilitation Act] and ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person.'" S.K. v. N. Allegheny Sch. Dist., 146 F. Supp. 3d 700, 711 (W.D. Pa. 2015) (quoting McCullum v. Orlando Regional Healthcare Sys., Inc., 768 F.3d 1135, 1142 (11th Cir. 2014) and citing Doe v. Cnty. of Centre PA, 242 F.3d 437, 447 (3d Cir. 2001) ("The protections

of the ADA extend to 'qualified individuals' who are discriminated against because of their relationship or association with individuals who have a known disability.")).   To state a claim for associational discrimination, a plaintiff must allege:

> (1) a logical and significant association with an individual with disabilities; (2) that a public entity knew of that association; (3) that the public entity discriminated against them because of that association; and (4) they suffered a direct injury as a result of the discrimination.

S.K. v. N. Allegheny Sch. Dist., 146 F. Supp.3d at 711–12 (quoting Schneider v. Cnty. of Will, 190 F. Supp.2d 1082, 1091 (N.D. Ill. 2002) and citing 28 C.F.R. § 35.130(g)); see also United States v. Nobel Learning Communities, Inc., No. CIV.A. 09-1818, 2010 WL 1047730, at *4 (E.D. Pa. Mar. 19, 2010), *as amended* (Mar. 24, 2010) (associational discrimination "requires a separate and distinct denial of a benefit or service to a non-disabled person; it may not be premised on a derivative benefit or harm based on treatment towards a disabled person").

Both Plaintiffs Mr. J.C. and Mrs. K.C. assert claims of associational discrimination brought under the ADA (Count III) and Section 504 of the Rehabilitation Act (Count IV).  ECF No. 1 ¶¶ 168-179. The School District argues that Mrs. K.C. fails to state a claim of associational discrimination because she has not plead a separate and distinct discrimination suffered by her as a result of associating with a disabled individual; that she did not suffer a direct injury as a result of discrimination; and that she is unable to show intentional discrimination towards her sufficient to sustain a claim for emotional distress.  ECF No. 10 at 12-17.

Plaintiffs argue that Mrs. K.C. has sufficiently alleged a direct discrimination against her by alleging that: (1) the School District failed to provide sufficient supervision and support to T.C., thereby denying him access to his education; (2) the School District ignored Mr. J.C. and

16

Mrs. K.C.'s concerns, resulting in T.C. being denied adequate supervision; and (3) the School District, through Vocational Center employees, failed to provide necessary information regarding T.C.'s behaviors to Mr. J.C. and Mrs. K.C., which directly prevented Mr. J.C. and Mrs. K.C. from effectively participating as members of T.C.'s IEP team. ECF No. 12 at 13, citing ECF No. 1 ¶¶ 173-175.

In their Complaint, Plaintiffs allege that "despite Mr. J.C. and Mrs. K.C.'s constant efforts and requests" the School District "continuously fail[ed] to provide sufficient supervision and support . . . to allow T.C. to access his education." ECF No. 1 ¶ 173. Plaintiffs also allege that T.C. was denied adequate supervision as a result of the School District "ignor[ing] Mr. J.C. and Mrs. K.C.'s concerns." Id. ¶ 174. The injuries alleged in these allegations appear to be directly suffered by T.C., i.e., that T.C. did not have adequate supervision and support and was denied access to his education. The process of an IEP team meeting includes all members of the team providing input to benefit the student. To the extent a parent expresses a desire for the provision of services that the school district in part or in whole disagrees with it is difficult to describe the district's actions as being a direct discrimination against the parent. The IDEA provides for procedures to resolve such expected disagreements. Standing alone Plaintiffs allegations of injury do not generally allege a direct injury suffered by Mrs. K.C. as a result of discrimination towards her because of her association with T.C. Thus, an associational discrimination claim based on a parent's allegation that the School District ignored her concerns must be something more than a disagreement about the direction of a student's IEP and the provision of services.

Here, Mrs. K.C. argues that the right to, and benefit of, meaningful participation in an IEP team meeting is a direct right and benefit to Mrs. K.C. and that it was her, not T.C., who was deprived of this right. As a central component of their associational discrimination claims Plaintiffs allege that the School District ignored Mr. J.C. and Mrs. K.C.'s expressions of concern regarding T.C.'s supervision and support. In addition, Plaintiffs allege direct discrimination against Mrs. K.C. based on the allegation that Vocational Center "staff, who are agents of the [School] District, failed to provide Mr. J.C. and Mrs. K.C. with necessary information regarding T.C.'s behavior at the [Vocational Center], which prevented Mr. J.C. and Mrs. K.C. from effectively participating as members of T.C.'s IEP team." ECF No. 1 ¶ 175. In their brief, Plaintiffs explain the alleged direct discrimination is the School District "failed to permit meaningful parental participation" in the IEP team meetings, "denied [Mrs. K.C.] the benefit of participation, not her son", and denied "*her* right to participate as part of the IEP team." ECF No. 12 at 14-15 (emphasis in original).

Plaintiffs do not allege that the School District actually failed to include Mrs. K.C. in any IEP team meeting or that the School District took affirmative action to deny Mrs. K.C. the right to participate as part of the IEP team, such as not inviting her to an IEP team meeting, physically barring her access, or otherwise preventing her participation. Allegations in the Complaint referring to IEP team meetings support the proposition that Mr. J.C. and Mrs. K.C. regularly had access to, and participated in, IEP team meetings. See, e.g., ECF No. 1 ¶¶ 34-35, 43-44, 55, 59, 61, 77. The only reason Mrs. K.C. is attending an IEP team meeting is to be involved in the IEP process for the benefit of T.C. For an associational discrimination claim to survive a motion to dismiss, Mrs. K.C. would have to allege that her right to attend and meaningfully participate in

the IEP planning process was somehow interfered with in a way that cut her off from meaningful access to the process.

Viewing Mrs. K.C.'s allegations in a light most favorable to her, and the reasonable inferences therefrom, the Court concludes that she has alleged a sufficient claim. Mrs. K.C. alleges that Vocational Center staff failed to provide significant information the staff learned about T.C. while T.C. attended the Vocational Center. By being denied information about T.C.'s behavior at the Vocational Center, Mrs. K.C. argues that she was constructively denied the right to participate as part of the IEP team. It is a reasonable inference that had Vocational Center staff told Mrs. K.C. about T.C.'s behaviors at the Vocational Center, Mrs. K.C. would have been able to act upon that information in an IEP team meeting to benefit T.C. In addition, Plaintiffs allege that the School District failed to take Mrs. KC. and Mr. J.C.'s expressions of concern about T.C. more seriously. A plausible inference from the allegations is that T.C.'s parents were informing the School District that they were concerned about T.C.'s safety and whether he was being provided with adequate supervision at the same time that the Vocational Center staff knew what was happening to T.C. at the center. The Complaint therefore sets forth a constructive denial of Mrs. K.C.'s right to participate in IEP team meetings as a part of the IEP team based on the failure of the School District to provide her with critical information that she could have used at IEP team meetings to benefit T.C. Therefore, the Court concludes that Mrs. K.C. has sufficiently alleged a separate and distinct discrimination suffered at the hands of the School District as a result of her association with T.C. to survive a motion to dismiss at this early stage of the litigation.

The Court notes that this is close call because Plaintiffs do not allege that the Vocational Center employees kept information *specifically* from Mrs. K.C. with the intention that Mrs. K.C. would therefore be unable to bring such information to an IEP team meeting. In this regard, however, the Complaint does allege that in March 2015, a Vocational Center special education teacher participated in T.C.'s IEP team meeting. ECF No. 1 ¶ 61. At this meeting Mr. J.C. and Mrs. K.C. "again expressed concerns regarding T.C.'s safety." Id. ¶ 61. Viewing the allegations in favor of Mrs. K.C., discovery may reveal that at the time of the March 2015 meeting, the Vocational Center special education teacher attending the meeting possessed critical information about how T.C. was actually being treated at the Vocational Center and intentionally chose not to disclose that information at the meeting or thereafter. While the lack of information about how T.C. was being treated at the Vocational Center certainly worked as a direct injury to T.C., it is also plausible that the failure to divulge the information to Mrs. K.C. in fact deprived her of her right to meaningful participation in IEP team meetings. It would be premature to decide at this stage that the harm suffered by Mrs. K.C. was derivative of the harm to T.C.

A discussion of relevant case law highlights the difficulty of making a determination of this claim at the pleading stage. In S.K. v. N. Allegheny School District, a decision relied on by Defendant, the school district provided transportation for all school students to daycare facilities within the district's boundaries. S.K. v. N. Allegheny School District, 146 F. Supp.3d at 704. The school district refused to transport the disabled child, S.K., to a daycare that was able to meet the child's medical needs because it was located outside the district's borders. Id. While providing transportation for S.K. to an appropriate daycare facility surely benefits S.K., the S.K. Court characterized the benefit at issue in the case as the provision of daycare transportation

20

services as a direct benefit to parents.  Id. at 715 (school district refused to provide "access to the [transportation] program equal to that of parents with nondisabled children"); see also United States v. Nobel Learning Communities, No. 1:17-CV-366 (NLH/JS), 2017 WL 4697050, at *8 (D.N.J. Oct. 19, 2017) (finding daycare services are benefit "agreed to between the parents and the institution, which provides parents with otherwise unavailable time apart from their children").  The Court clarified that when viewing the allegation in favor of K.K., the Court had "to infer plausibly that there was a direct benefit to K.K. provided by the transportation service, [because] the court could not plausibly infer that the transportation service offered only derivative benefits to K.K., who would otherwise be responsible for transporting S.K." S.K., 146 F. Supp.3d at 714 n. 4.  Put in other words, the daycare transportation service benefited K.K. by providing her with free time apart from S.K. that she would not otherwise have regardless of the benefit S.K. would derive from being transported to an appropriate daycare facility.

In this case the distinction is not as clear.  While the Court plausibly infers a benefit to Mrs. K.C. from meaningful participation in T.C.'s IEP team meetings, as explained above, the associational discrimination claim depends on something more than just disagreement about the student's IEP; an IEP, which in the normal course of events, provides a direct benefit to the student.  In S.K., the Court was able to distinguish clearly that K.K. received the separate benefit of being free of transportation responsibilities.  Moreover, Plaintiffs here do not allege that the School District knew that Mrs. K.C. would not be able to participate in IEP team meetings because of T.C.'s disabilities, whereas the school district in S.K. knew that K.K. could not participate in the district's typical daycare transportation services because of S.K.'s disability.

At this stage, the Court presumes that Mrs. K.C. is entitled to participate in IEP team meetings as a right and benefit separate and apart from the benefit T.C. receives from Mrs. K.C.'s participation in such meetings. Whether discovery will show that the benefit was *separate enough* from the benefit direct towards T.C., and whether it was done because of Mrs. K.C.'s association with T.C., remains to be seen. Allegations that the School District intentionally kept critical information from Mrs. K.C. in order to prevent her from using that information at an IEP team meeting sufficiently alleges a separate and distinct discrimination against Mrs. K.C. to state a claim.[3]

A review of cases involving associational discrimination claims supports the conclusion reached in this case. In Eskenazi-McGibney v. Connetquot Central School District, the parents' associational claim survived a motion to dismiss where they alleged they were denied access to school grounds and their child's teacher based on association with their disabled son; specifically, advocating on the child's behalf who was being bullied. Eskenazi-McGibney v. Connetquot Central School District, 84 F. Supp.3d 221, 230 (E.D.N.Y. 2015). The District Court concluded that whether the denial of access to school grounds occurred for some other reason, such as "the parents' alleged interference with certain school functions," is a question of causality "appropriately reserved for summary judgment or a factfinder at trial." Id.

In Simenson v. Hoffman, parents of a disabled child were unable to sustain an associational discrimination claim against a medical center where they had brought their child

---

[3] Similarly, as stated earlier in the text, allegations that the School District told Mrs. K.C. she was not permitted to participate in an IEP team meeting or that the School District failed to invite her to IEP team meetings, or otherwise intentionally interfered with her ability to participate, would also be indicative of a direct and distinct harm to Mrs. K.C. as it would show that the School District's conduct was directed specifically towards Mrs. K.C. The Complaint, however, does not make such allegations. In any event, such allegations must also establish that such conduct was done because of Mrs. K.C.'s association with T.C. and not for some other reason.

for treatment. A doctor at the medical center refused to treat the child, allegedly on the basis of the child's skin disorder, and ejected the parents and child from the medical center. <u>Simenson v. Hoffman</u>, No. 95 C 1401, 1995 WL 631804 (N.D. Ill. Oct. 24, 1995). The discriminatory act was the denial of medical treatment for the disabled child and the District Court found that the parents being denied access to the medical center was derivative of their child being denied access to the medical center as it was the child who needed medical treatment. <u>Id.</u> at *6 (medical center's refusal to treat child and subsequent ejectment "was merely the final act in the decision to deny him medical treatment"). The parents purpose in being at the medical center was to seek treatment for their child, they themselves did not seek treatment at the medical center. In contrast, the <u>Simenson</u> Court explained by example that where those who associate with a disabled person and the disabled person are denied access to a movie theater or hotel, an associational claim may be premised on the denial of the direct benefit to the associating person of viewing a movie or securing a room. <u>Id.</u> <u>See also</u> <u>Micek v. City of Chicago</u>, No. 98 C 6757, 1999 WL 966970, at *4 (N.D. Ill. Oct. 4, 1999) (denying father's associational claim where disabled mother and son were denied benefit, but father suffered only an indirect injury).

Other cases are instructive in showing when an associated person suffers a fairly clear distinct and separate injury from the disabled person. <u>Loeffler v. Staten Island Univ. Hosp.</u>, 582 F.3d 268, 281 (2d Cir. 2009) (hospital's discrimination against deaf parents by failing to provide interpreter was a separate, independent injury to deaf parents' minor children who, because they were forced to interpret for their parents, suffered direct, separate injuries of exposure to parent's health condition, forced to miss school and were "unnecessarily placed at risk for emotional trauma because of their young age"); <u>Milan v. Pyros</u>, No. CIV.A. 08-320, 2008 WL 1994863, at

*24 (W.D. Pa. May 5, 2008) (disability advocacy organization and CEO threatened with retaliatory ejectment from their leases because of their association with disabled persons); Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 48 (2d Cir. 1997) (drug and alcohol rehabilitation center denied permit because of its association with disabled persons); Oak Ridge Care Center, Inc. v. Racine County, 896 F. Supp. 867, 872 (E.D. Wis. 1995) (elder care facility denied permit because of its association with disabled persons). Cases where a disabled person was able to assert a discrimination claim based on association with a non-disabled primary beneficiary of a service also demonstrate what is necessary for discrimination to be separate and distinct. Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173 (11th Cir. 2007) (seeing-impaired parent with service animal denied opportunity to accompany child who was receiving treatment; defendant unsuccessfully argued that parent cannot sustain a claim because child was primary beneficiary of receiving treatment at medical facility); Bravin v. Mount Sinai Medical Center, 58 F. Supp. 2d 269 (S.D.N.Y. 1999) (defendant denied deaf husband a sign language interpreter to help him understand teacher at Lamaze class his wife and him attended; defendant's argument that husband had no claim because the mother was the patient was not successful); and Rothschild v. Grottenthaler, 907 F.2d 286 (7th Cir. 1990) (deaf parents precluded from attending parent activities at child's school because school failed to provide sign language interpreter; defendant unsuccessfully argued parents cannot sustain claim because the child was the primary beneficiary of school enrollment).

Once again the Court emphasizes that at this stage it is not clear whether Mrs. K.C.'s associational discrimination claim is more like the parents in Eskenazi-McGibney who were denied access to school grounds, perhaps because of their association with their disabled child,

perhaps for a separate reason; or whether the claim is more like <u>Simenson</u> where the parents took their disabled child for medical treatment but did not themselves seek medical treatment. Mrs. K.C. may have been prevented from meaningful access to IEP team meetings when she was denied critical information because of her association with T.C., but also discovery may show that she was not denied access; that there was no information kept from her; or that any information not relayed to her occurred as the result of negligence or incompetence. The claim may also prove to be as the School District characterizes at this stage: that Mrs. K.C.'s allegation of discrimination is simply that T.C. was denied his rights and benefits that flow from any parent's participation in an IEP team meeting, and Mrs. K.C. did not suffer a separate and distinct injury.

For these reasons, the Court concludes that at this stage of the pleadings, Mrs. K.C. has alleged a separate and distinct discrimination claim based on her association with T.C. causing her to be deprived the right to and benefit of meaningful participation in IEP team meetings. Accordingly, the Court will deny the School District's Motion to Dismiss Mrs. K.C.'s associational discrimination claims. Based on the Court's resolution of the motion, whether Mrs. K.C. may recover for emotional distress on her associational discrimination claim need not be resolved as whether deliberate indifference can be shown also depends on what facts are

developed during discovery to support the allegations. The viability of this claim may be revisited at the summary judgment stage of this case.

## V. CONCLUSION

For the foregoing reasons, the Partial Motion to Dismiss filed on behalf of Defendant Hempfield Area School District, ECF No. 9, will be denied.

An appropriate Order will be entered:

## ORDER

AND NOW, this 3rd day of August, 2018, upon consideration of the Partial Motion to Dismiss filed on behalf of Hempfield Area School District, ECF No. 9, and for the reasons set forth in the accompanying opinion, IT IS HEREBY ORDERED that the motion is **DENIED**.

Pursuant to Federal Rule of Civil Procedure 12(a)(4)(A), Defendant Hempfield Area School District shall file a responsive pleading on or before August 24, 2018.

BY THE COURT,

MAUREEN P. KELLY
Chief United States Magistrate Judge

cc:     All Counsel of Record via CM/ECF

26